06-0104-cv
Karpova v. Snow

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued September 11, 2006          Decided August 14, 2007)

Docket No. 06-0104-cv

_____

Judith Karpova,

Plaintiff-Appellant,

v.

John Snow, Secretary, Department of the Treasury,
United States of America,

Defendants-Appellees.

_____

Before:
CARDAMONE, SOTOMAYOR, and KATZMANN,
Circuit Judges.

_____

Plaintiff Judith Karpova appeals from the judgment entered October 31, 2005 in the United States District Court for the Southern District of New York (McMahon, J.) dismissing her complaint. Karpova alleged the Department of Treasury's Office of Foreign Assets Control had violated her constitutional rights and acted in an arbitrary and capricious manner in violation of the Administrative Procedure Act when it fined her for traveling to Iraq in violation of the Iraqi Sanctions Regulations.

Affirmed.

_____



MICHAEL H. SUSSMAN, Law Offices of Michael H. Sussman, Goshen, New York, for Plaintiff-Appellant.

ROSS E. MORRISON, Assistant United States Attorney, New York, New York (Michael J. Garcia, United States Attorney, Sara L. Shudofsky, Assistant United States Attorney, Southern District of New York, New York, New York, of counsel), for Defendants-Appellees.

_____

CARDAMONE, Circuit Judge:

Plaintiff Judith Karpova (plaintiff or appellant), a resident of New York State and an American citizen, traveled to Iraq in 2003. Purporting to belong to a group known as the Truth, Justice, and Peace Human Shield Action Project (Project), whose aim was to deter the bombing of civilian infrastructure facilities by acting as human shields at such sites in that country, plaintiff claims she went to Iraq in three capacities: as an ordained minister to bear witness to the effect on Iraq's people of economic sanctions, as a professional writer and journalist sending letters or reports to the Jersey Journal, a daily newspaper in Jersey City, New Jersey, and as a human shield to prevent destruction of civilian infrastructure in the event of renewed hostilities. Unfortunately, in doing this and despite her good intentions, plaintiff transgressed several executive orders and United States Treasury Department regulations that governed what interactions United States citizens could have with Iraq while economic sanctions were in place.

Because plaintiff violated those orders and regulations, the Office of Foreign Assets Control within the United States Department of the Treasury (Foreign Assets Control Office or Agency) assessed against her a civil monetary penalty of $6,700. To set aside this fine, plaintiff brought suit against the government in the United States District Court for the Southern District of New York (McMahon, J.). In her complaint plaintiff alleged that her First and Fifth Amendment rights were violated

2

and that the government had engaged in final agency action against her in an unlawful manner. Judge McMahon granted summary judgment in favor of the government, dismissing plaintiff's complaint in a judgment entered October 31, 2005. From that judgment Karpova appeals.

BACKGROUND

A. Statutory and Regulatory Background

In 1990 Congress passed the Iraqi Sanctions Act, which among other things, directed the President to "continue to impose the trade embargo and other economic sanctions with respect to Iraq." Pub. L. No. 101-513, § 586C(a), 104 Stat. 1979, 2048 (1990). President Bush issued executive orders premised on the notion that Iraqi government policies constituted an unusual and extraordinary threat to the national security of the United States, directing that economic sanctions be imposed on Iraq and authorizing the Secretary of the Treasury to promulgate regulations implementing prohibitions on, among other things, the exportation of services to Iraq and transactions related to travel to Iraq. Exec. Order No. 12,722, 55 Fed. Reg. 31,803 (Aug. 2, 1990); Exec. Order No. 12,724, 55 Fed. Reg. 33,089 (Aug. 9, 1990). On January 18, 1991 the Foreign Assets Control Office of the United States Treasury Department issued the Iraqi Sanctions Regulations (regulations) implementing the prohibitions outlined in the President's executive orders and outlining procedures for dealing with violations. See 31 C.F.R. §§ 575.204-211, 575.702-704.

3

Under these regulations, the Foreign Assets Control Office may demand that people engaging in transactions related to Iraq provide it with complete information relative to those transactions. See 31 C.F.R. § 501.602. When the Agency has a reasonable belief that a violation of the regulations has occurred, it issues a Prepenalty Notice. 31 C.F.R. § 575.702. The Prepenalty Notice informs the alleged violator that a monetary penalty will be imposed unless he or she responds in writing explaining why a penalty is inappropriate. Id. If the recipient replies in such a manner, the Director of the Foreign Assets Control Office then makes a final determination as to whether a violation has occurred and, if so, what financial penalty should be imposed. Such final determination is set forth in a Penalty Notice. 31 C.F.R. § 575.704.

## B. Karpova Travels to Iraq

In early 2003 the Project hoped to bring attention to the fact that the United States allegedly had bombed civilian infrastructure in Iraq during the 1990 Gulf War. The method the Project chose to get public attention was to send non-Iraqis to these sites to act as human shields. The presence of civilians at the sites, it was hoped, would publicize the threat to them were the United States to begin a bombing campaign, and perhaps deter the United States from acting. Plaintiff Karpova joined this group and sent a letter to supporters indicating her plans to travel to Iraq in February 2003 as a member of the Project. She requested supporters to send small donations to help finance

4

her travel expenses. On February 19, 2003 she arrived in Iraq and remained there until March 9. Karpova did not obtain a license that might have authorized her, despite the economic sanctions, to engage in travel-related transactions involving Iraq. While there, plaintiff acted as a preemptive human shield. Although Karpova left the country before the United States' bombing campaign actually began, appellant was near an oil refinery while in Iraq. Karpova also went on guided tours in Basra and Baghdad, visited hospitals and schools, and spent time "looking, listening, talking, and writing." Her writing took the form of four letters sent back to America that were printed in installments by the Jersey Journal. The Foreign Assets Control Office learned of Karpova's unauthorized trip from press accounts.

## C. Agency's Response

On March 20, 2003 the Foreign Assets Control Office sent a letter to plaintiff requiring that she provide the Department of the Treasury with a detailed written report concerning her trip to Iraq, so that it could ascertain whether she had violated the Iraqi Sanctions Regulations. This "Requirement to Furnish Information" specifically required Karpova to provide the dates of her travel to Iraq, reason for her trip, and a detailed itemization of all travel-related transactions in which she engaged in connection with her trip. Plaintiff responded on April 21, 2003 with a lengthy letter, which included the dates and various reasons for her trip, but failed to provide a

5

detailed itemization of all travel-related transactions. Instead, she simply asserted that all of her travel-related transactions were taken care of by an organization called the Peace, Friendship, and Solidarity Organization, and thus that she was not required to spend any money during her 19 days in Iraq.

Plaintiff did not provide any proof to support her statements despite the Agency's request that she provide a copy of any travel-related receipts or records associated with her expenditures in Iraq. The Agency replied on June 23, 2004 by sending Karpova a Prepenalty Notice stating she had violated the Iraqi Sanctions Regulations by exporting her services to Iraq and engaging in unauthorized travel-related transactions while there. The Prepenalty Notice cited the following specific violations: (1) attempting to collect funds for travel expenses to/from/ within Iraq, (2) departing Jordan for Iraq and arriving in Iraq, (3) providing ministerial services, (4) serving as a freelance journalist, (5) providing services to the government of Iraq by shielding Iraqi government infrastructure from possible United States military action, and (6) engaging in travel-related transactions, including the purchase of food. The Prepenalty Notice proposed a penalty of $10,000, and it gave Karpova an opportunity to submit a written response. The Prepenalty Notice requested that Karpova explain why the penalty should not be issued or why, if issued, it should be reduced.

Karpova answered this request on August 5, 2004 with a letter from her lawyer arguing that she had not provided services

to any agency of the Iraqi government. The letter contended that the regulatory scheme under the Iraqi Sanctions Regulations violated Karpova's due process rights and exceeded the authority of the Executive branch, and that the penalty violated Karpova's First and Fifth Amendment rights. She did not dispute that she had engaged in transactions related to travel in Iraq, but she incorporated by reference her previous letter as something for the Foreign Assets Control Office to consider in determining the appropriate penalty.

On March 14, 2005 the Agency sent Karpova a Penalty Notice. The Penalty Notice ruled that she had violated the Iraqi Sanctions Regulations by engaging in prohibited transactions relating to Iraq, as detailed in the Prepenalty Notice. It explained that Karpova's response had not presented any new facts or explanations to refute the Foreign Assets Control Office's charges that Karpova violated the regulations. The fine was reduced from $10,000 to $6,700 in light of the fact that plaintiff had provided a written response to the Prepenalty Notice and because it was her first offense.

### D. The Instant Suit

On June 9, 2005 plaintiff brought the instant suit alleging that the fine imposed against her for her travel to Iraq was arbitrary and capricious in violation of the Administrative Procedure Act and unconstitutional under the First and Fifth Amendments. She also claimed the Iraqi Sanctions Regulations were themselves unlawful. Karpova requested the district court

7

declare the Penalty Notice and 31 C.F.R. § 575.207 (prohibited transactions relating to Iraq) null and void and sought a permanent injunction preventing the United States from blocking or restricting her First and Fifth Amendment rights. On October 25, 2005 the district court granted summary judgment in favor of the government and dismissed Karpova's complaint in its entirety. This appeal followed.

## DISCUSSION

### I Administrative Procedure Act Claims

On appeal from a grant of summary judgment involving a claim brought under the Administrative Procedure Act, we review the administrative record de novo without according deference to the decision of the district court. Supreme Oil Co. v. Metro. Transp. Auth., 157 F.3d 148, 151 (2d Cir. 1998) (per curiam). Under 5 U.S.C. § 706(2)(A) a reviewing court must hold unlawful and set aside any agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. However, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow," and courts should not substitute their judgment for that of the agency. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Instead, an agency determination will only be overturned when the agency

> has relied on factors which Congress has not
> intended it to consider, entirely failed to
> consider an important aspect of the problem,
> offered an explanation for its decision that
> runs counter to the evidence before the

8

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Id. In other words, so long as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action, even a decision that is not perfectly clear, provided the agency's path to its conclusion may reasonably be discerned. Id.

The Penalty Notice was far from clear. It did not explicitly set forth the basis for its determination that Karpova violated the Iraqi Sanctions Regulations. Instead, it referenced the fact that the Prepenalty Notice had accused her of engaging in certain prohibited transactions relating to Iraq and found that such transactions violated the regulations. The Prepenalty Notice had listed a number of different violations of the regulations assertedly committed by Karpova and accused appellant of "exportation of services to Iraq" in violation of 31 C.F.R. § 575.205 and of "unauthorized travel-related transactions in Iraq" in violation of 31 C.F.R. § 575.207.

Specifically, the Prepenalty Notice had accused her of the six acts outlined a moment ago and had cited the applicable regulations. But strikingly, in the first paragraph of the Penalty Notice, where the charge against Karpova and the Agency's ruling are listed, there is no mention of plaintiff providing services to Iraq. Instead, the Penalty Notice just cited the accusation that Karpova had engaged in the transactions detailed

9

in the Prepenalty Notice and ruled that "such transactions violated the Iraqi Sanctions Regulations" (emphasis added). As a consequence, in determining whether the regulations were applied in an arbitrary and capricious manner, we look at whether the transactions listed in the Prepenalty Notice were sufficient to support the Agency's determination that Karpova violated § 575.207 by "engag[ing] in any transaction relating to travel by any U.S. citizen . . . to Iraq."

We turn first to the specific allegations against appellant. The three transactions Karpova was accused of were: (1) attempting to collect funds for travel expenses to/from/within Iraq, (2) departing Jordan for Iraq and arriving in Iraq, and (6) purchasing food while in Iraq. It was not arbitrary and capricious for the Foreign Assets Control Office to determine that Karpova had engaged in these three transactions. Karpova's own letter indicated that she solicited small donations to help finance her travel expenses to Iraq. The regulations do not define the term "transaction," but it was not unreasonable for the Agency to decide that solicitation of funds constitutes a transaction. Appellant admitted in addition in her letter replying to the Prepenalty Notice that she traveled to Iraq during the winter of 2003. Insofar as the purchase of food in Iraq is concerned, appellant conceded in an article she submitted to the Jersey Journal that although she was not paying for living expenses during her first week in Iraq, she expected her group would start paying its way once they got organized. Plaintiff

10

subsequently maintained she was not required to spend any money in Iraq, but she did not adduce any proof to support that assertion despite the demand that she provide a detailed itemization of all travel-related transactions backed by pertinent records. Given the foregoing, it was not arbitrary and capricious for the Agency to rule Karpova had engaged in transactions relating to travel in Iraq in violation of the regulations. Thus, the Agency's action may not be faulted under the Administrative Procedure Act.

We note next that the Penalty Notice also mentioned that appellant had provided a service to the government of Iraq by shielding the oil refinery from possible United States military action. This indicates that perhaps Karpova was fined not only for the transactions she engaged in, but also for the services she provided. Further, the Prepenalty Notice could be read to imply that Karpova was punished for engaging in another type of service as well -- serving as a freelance journalist. If so, then the Agency's determination was flawed. There is no indication in the record that she sought to render this service to the Iraqi government, and so the Agency would have acted arbitrarily and capriciously had it punished her for this activity. However, we need not determine the exact contours of the conduct for which appellant was fined, since the Foreign Assets Control Office could have fined her $6,700 for committing any one of the six alleged acts. See 31 C.F.R. § 575.701. Thus, it is unnecessary to consider whether the services provided by

11

appellant to Iraq could have served as an alternative basis for this penalty.

Even if we were to conclude the Agency alternatively based the fine on one or more of the alleged services provided by Karpova, and find such alternative grounds were flawed, remand is not required here. We are confident that the Agency would reach the same conclusion absent any such error. See, e.g., NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969) (not requiring remand where it serves as an "idle and useless formality"); NLRB v. Am. Geri-Care, Inc., 697 F.2d 56, 64 (2d Cir. 1982) (stating that remand is required "only where there is a significant chance that but for the error, the agency might have reached a different result").

Similarly, even if plaintiff is correct that some of the transactions she engaged in in Iraq related to journalistic activities and thus were exempted from sanction by § 575.207, remand on that basis would be futile. By way of background, § 575.207 provides that transactions "[r]elating to journalistic activity by persons regularly employed in such capacity by a newsgathering organization" are not sanctionable, and § 575.416(b)(1) clarifies that certain freelance journalists are covered by § 575.207's exemption. Karpova's argument is that her solicitation of funds, her travel to Iraq, and her purchase of food all related to her freelance journalistic activity, and thus were not sanctionable under the regulations. Unfortunately, the Agency did not provide much explanation on this issue; it merely

12

noted in the Prepenalty Notice that Karpova acted as a freelance journalist while in Iraq, but failed to address in its final decision whether she qualified as a journalist under § 575.416 and whether these transactions were covered by this exception. Yet, plaintiff overlooks § 575.416(c), which notes that "[a]uthorized travel transactions are limited to those incident to travel for the purpose of collecting and disseminating information for a recognized newsgathering organization, and <u>do not include travel transactions related to any other activity in Iraq</u>" (emphasis added). Karpova admits that among her activities within Iraq were excursions to "defend Iraqi civilian infrastructure from bombing." Such activity clearly would not fall within the journalistic exception, and thus we are confident the Agency would reach the same conclusion even were we to determine that some of Karpova's activities in Iraq were exempted by the journalistic exception.

Appellant finally declares that the regulations themselves exceeded the authority Congress gave to the President to limit economic contact with Iraq. This argument may be swiftly rejected. The regulations were promulgated to implement executive orders which were issued under the authority granted to the President by both the International Emergency Economic Powers Act, 50 U.S.C. § 1701 <u>et</u> <u>seq</u>. and the United Nations Participation Act (UNPA), 22 U.S.C. § 287 <u>et</u> <u>seq</u>. <u>See</u> Exec. Order No. 12,722, 55 Fed. Reg. 31,803 (Aug. 2, 1990); Exec. Order No. 12,724, 55 Fed. Reg. 33,089 (Aug. 9, 1990); <u>see</u> <u>also</u> <u>Sacks v.</u>

13

Office of Foreign Assets Control, 466 F.3d 764, 775-77 (9th Cir. 2006); Office of Foreign Assets Control v. Voices in Wilderness, 329 F. Supp. 2d 71, 78 (D.D.C. 2004) (finding authority solely under the UNPA). In addition, the Iraqi Sanctions Act of 1990 directed the President to "continue to impose the trade embargo and other economic sanctions with respect to Iraq and Kuwait that the United States is imposing . . . pursuant to Executive Order[] Numbered 12724 . . . , and, to the extent [it is] still in effect, Executive Order[] Numbered 12722 . . . ." Pub. L. No. 101-513, § 586C(a), 104 Stat. 1979, 2048 (1990). To the extent that appellant asserts that there was not a "legal predicate for imposition and extension of the economic sanctions" because there had been no finding that the Iraqi regime posed "an urgent threat to the security of the United States in 2003[]," we note that in deciding to impose sanctions the President was acting in the area of foreign policy pursuant to congressional authorization. We review with great deference such executive branch determinations. Palestine Info. Office v. Schultz, 853 F.2d 932, 937 (D.C. Cir. 1988). We decline to second-guess the President's determination that the Iraqi regime posed an urgent threat to the United States such that he could punish those who violated the economic and travel restrictions pursuant to the regulations. The district court's dismissal of plaintiff's challenge to the authority for the regulations should be affirmed.

14

## II  Procedural Due Process Claim

The district court granted the government summary judgment with respect to Karpova's due process claim. We review that grant de novo, construing the facts in the light most favorable to Karpova. See Tocker v. Philip Morris Cos., 470 F.3d 481, 486 (2d Cir. 2006). Summary judgment is only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law. Id. at 486-87.

### A.  Opportunity to be Heard

Under the Fifth Amendment's Due Process Clause no person may be deprived of life, liberty, or property without reasonable notice and an opportunity to be heard. See Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). The opportunity to be heard must be "at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976). However, the Due Process Clause does not necessarily require that a person be given an opportunity to be heard orally in a testimonial setting; the opportunity for written submissions may be sufficient. See Interboro Inst., Inc. v. Foley, 985 F.2d 90, 93 (2d Cir. 1993). The liberty interest and legal issues involved determine the kind of hearing necessary. Id. Therefore, in this context so long as those that are to decide have before them claimant's legal arguments and do not act on a one-sided or incomplete record, the Due Process Clause is satisfied. Id.

15

There is no dispute that appellant was given notice before she was fined. The key question is whether the opportunity she was given to be heard was sufficient. The Agency's procedural safeguards guaranteed that prior to fining Karpova, the Foreign Assets Control Office informed her of its tentative assessment, explained to her the basis for that assessment, provided her with a summary of the evidence it considered relevant, and offered her an opportunity to respond in a written presentation. See, e.g., Mathews, 424 U.S. at 346. The Agency considered the legal arguments in Karpova's written submissions and issued a ruling against her. Appellant has not identified in what way a testimonial hearing would have benefitted her. Thus, there is no genuine issue of material fact with regard to whether adequate notice and an opportunity to be heard were provided to plaintiff.

B. Did the Foreign Assets Control Office Act as Both Prosecutor and Judge?

We had a concern arising from appellant's arguments that due process may have been violated in this case because the same titled officer served as both prosecutor and judge in the administrative proceedings. The Supreme Court has explained that the combination of investigative and adjudicative functions in the same individual does not necessarily create an unconstitutional risk of bias so as to imperil the Due Process Clause's requirement that trials be held before fair tribunals. See Withrow v. Larkin, 421 U.S. 35, 46, 47, 57-58 (1975). Instead, courts make case by case judgments based on the special

16

facts and circumstances of each particular situation in determining whether the risk of unfairness is intolerably high. Id. at 58. However, we have recognized that it presents a troublesome question to determine when a single individual could serve as both prosecutor and judge in the same case without violating due process. MFS Sec. Corp. v. SEC, 380 F.3d 611, 618 (2d Cir. 2004). But here, when it is the same office -- rather than the same person -- that performs multiple functions, due process is not violated. Id. at 618-19.

Here, the Director of the Office of Foreign Assets Control performed a prosecutorial function by sending Karpova the June 23, 2004 Prepenalty Notice that first notified plaintiff of the specific charges against her. The Director of the same office made the Agency's final ruling against Karpova in the March 14, 2005 Penalty Notice. However, the Director on June 23, 2004 was R. Richard Newcomb, while the Director on March 14, 2005 was Robert W. Werner. Since the same individual did not perform adjudicative and non-adjudicative functions, there is no risk of bias in the case at hand and thus no due process violation.

### III  Right to Travel and Free Speech Claims

#### A.  Standard of Review

The trial court dismissed Karpova's First Amendment free speech and Fifth Amendment right to travel claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state claims. We review de novo a district court's decision to dismiss a complaint pursuant to Rule 12(b)(6), accepting as true all factual

17

allegations contained in the complaint and drawing all inferences in plaintiff's favor. Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 154 (2d Cir. 2006).

## B. Right to Travel Claim

Although the constitutional right to travel within the United States is virtually unqualified, the right to travel internationally is simply an aspect of the liberty protected by the Due Process Clause of the Fifth Amendment, and as such may be regulated within the bounds of due process. Califano v. Torres, 435 U.S. 1, 4 n.6 (1978) (per curiam). Therefore, this liberty interest does not itself overcome the weighty foreign policy concerns that may support travel restrictions. See Regan v. Wald, 468 U.S. 222, 242 (1984). The President, in an executive order implementing the economic sanctions authorized by Congress in the Iraqi Sanctions Act of 1990, declared that the "policies and actions of the Government of Iraq constitute an unusual and extraordinary threat to the national security and foreign policy of the United States," and therefore ordered that transactions by United States citizens relating to travel to Iraq be prohibited. Exec. Order No. 12,722, 55 Fed. Reg. 31,803 (Aug. 2, 1990). Since the restriction on engaging in such transactions was based on these concerns of foreign policy, the travel restriction was not a violation of Karpova's liberty interests under the Fifth Amendment's Due Process Clause.

18

## C.  Free Speech Claim

Under the First Amendment, a restriction against traveling to a specified country is "an inhibition of action," not speech. Zemel v. Rusk, 381 U.S. 1, 16 (1965).  As the Zemel Court explained, many restrictions on action could "be clothed by ingenious argument in the garb of decreased data flow."  Id. at 16-17.  Yet such arguments are to no avail since the First Amendment guarantees a citizen the right to speak and publish, but does not guarantee an unrestrained right to gather information.  Id. at 17.  Karpova was fined because of her actions in violating the travel regulations, not for her speech. Consequently, her First Amendment rights were not violated.

## CONCLUSION

Accordingly, for the foregoing reasons, the grant of summary judgment by the district court dismissing Karpova's complaint is affirmed.