State of New York v. Raimondo

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term 2022
Argued: May 24, 2023
Decided: October 13, 2023

Docket No. 22-1189

STATE OF NEW YORK, BASIL SEGGOS, as Commissioner of the New York State
Department of Environmental Conservation, NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,

*Plaintiffs-Appellants*,

v.

GINA RAIMONDO, in her official capacity as Secretary of the United States
Department of Commerce, UNITED STATES DEPARTMENT OF COMMERCE,
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NATIONAL MARINE
FISHERIES SERVICE, a/k/a NOAA FISHERIES,

*Defendants-Appellees*.

_____

Before:             WESLEY and PARK, *Circuit Judges*.*

_____

_____

* Circuit Judge Rosemary S. Pooler, who was a member of the panel, passed away on
August 10, 2023. Judge Pooler participated in the consideration and decision of this case
and had initial responsibility for the opinion of the Court. The two remaining members
of the panel have determined to issue this opinion. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b).

The federal government uses a fishery management plan to conserve and manage summer flounder, also known as fluke, off the Eastern Seaboard. Under the Magnuson-Stevens Fishery Conservation and Management Act, that fishery management plan must account for ten "national standards." Each national standard prioritizes a different objective: from preventing overfishing, to using accurate data, to promoting fairness and efficiency, to protecting existing fishing communities, and more.

Eleven states participate in the summer flounder fishery. The fishery management plan includes annual commercial quotas for each state, which determine how much summer flounder that state's fishermen can catch. One of those states, New York, brought this action against the National Marine Fisheries Service—the federal agency responsible for the summer flounder fishery—and several related federal entities. New York argues the current quotas fail to account for the long-term movement of summer flounder northward, closer to New York's shores. New York claims the quotas violate the Magnuson-Stevens Act as well as the Administrative Procedure Act. The district court rejected that argument; it granted summary judgment to the Fisheries Service.

We conclude that in setting each state's summer flounder quotas, the Fisheries Service properly weighed the relevant statutory considerations. We therefore **AFFIRM** the judgment of the district court.

————————————

STEPHEN J. YANNI, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Judith N. Vale, Deputy Solicitor General, *on the brief*) for Letitia James, Attorney General of the State of New York, New York, NY *for Plaintiffs-Appellants*.

LUCAS ISSACHAROFF, Assistant United States Attorney (Benjamin H. Torrance, Assistant United States Attorney, *on the brief*) for Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Defendants-Appellees*.

HOPE SENZER GABOR, Assistant County Attorney, for Dennis M. Cohen, Suffolk County Attorney, Suffolk, NY, *for Amicus Curiae Suffolk County*.

————————————

WESLEY, *Circuit Judge*:

The federal government uses a fishery management plan to conserve and manage summer flounder, also known as fluke, off the Eastern Seaboard. Under the Magnuson-Stevens Fishery Conservation and Management Act (the "MSA"), 16 U.S.C. §§ 1801 *et seq.*, that fishery management plan must account for ten "national standards." Each national standard prioritizes a different objective:

3

from preventing overfishing, to using accurate scientific data, to promoting efficiency, to protecting existing fishing communities, and more.

Eleven states participate in the summer flounder fishery. The fishery management plan includes annual commercial quotas for each state, which determine how much summer flounder that state's fishermen can catch. One of those states, New York, brought this action against the National Marine Fisheries Service (the "NMFS")—the federal agency responsible for the summer flounder fishery—and several related federal entities. New York argues that in setting the current quotas, the NMFS failed to account for the long-term movement of summer flounder northward, closer to New York's shores. New York claims the quotas violate several of the MSA's national standards as well as the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701 *et seq.* The district court rejected that argument; it granted summary judgment to the NMFS.

We conclude that in setting each state's summer flounder quotas, the NMFS properly weighed the relevant statutory considerations. We therefore affirm the judgment of the district court.

## BACKGROUND

Summer flounder are a sought-after commercial fish. Their habitat spans the Eastern Seaboard, but during winter months they concentrate in offshore waters managed by the federal government through the NMFS.[1] Commercial fishermen in eleven coastal states, from Maine to North Carolina, fish these waters.

The NMFS regulates the commercial summer flounder catch through a fishery management plan. Congress, through the MSA, requires the fishery management plan to account for ten national standards. Those national standards are set forth in full below, but at a high level, they seek to conserve and manage the fishery for future generations. *See* 16 U.S.C. § 1802(5) (defining "conservation and management"); *id.* § 1851(a) (requiring "conservation and management" measures to comport with the ten national standards).

The summer flounder fishery incorporates a quota system designed to prevent overfishing. Each state is allocated a quota percentage of the total summer flounder catch for the year. Any summer flounder that are "landed" (brought

---

[1] "The federal government is responsible for regulation of the 'exclusive economic zone'—waters from three to 200 miles from shore." *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 527 (2d Cir. 2010). By contrast, states "retain primary authority over the conservation and management of fisheries within the 'territorial sea'—waters within three miles of shore, as well as in rivers and estuaries." *Id.*

ashore) in a state count towards that state's annual quota—regardless of where those fish were caught. For example, fishermen from Virginia catch summer flounder near Long Island, New York, "land" those fish back in Virginia, and those fish count towards Virginia's quota.

The NMFS first incorporated quotas into the fishery management plan in 1992, with a slight adjustment in 1993 (the "1993 Allocation Rule"). At that time, each state's quota was based on how much summer flounder that state had landed from 1980 through 1989. From 1993 onward, New York received authorization for approximately 7% of each year's total catch. States with higher historical landings received higher quotas: for example, Virginia received approximately 21% of each year's total catch.[2]

Since 1993, however, summer flounder populations have shifted steadily northward, closer to the coast of New York. In response, NMFS undertook a rulemaking process to reassess and potentially revise the quota system. It completed that process in 2020, when it promulgated a new rule (the "2020

---

[2] The exact baseline quotas are as follows: Maine 0.04756%; New Hampshire 0.00046%; Massachusetts 6.82046%; Rhode Island 15.68298%; Connecticut 2.25708%; New York 7.64699%; New Jersey 16.72499%; Delaware 0.01779%; Maryland 2.03910%; Virginia 21.31676%; North Carolina 27.44584%. *See* 58 Fed. Reg. 49,937, 49,940 (Sept. 24, 1993) (codified at 50 C.F.R. § 625.20).

Allocation Rule") that New York now challenges. *See* 85 Fed. Reg. 80,661 (Dec. 14, 2020) (codified at 50 C.F.R. § 648.102(c)(1)).

The 2020 Allocation Rule retains each state's original quota from the 1993 Allocation Rule—but only up to the first 9.55 million pounds of summer flounder caught. *See* 50 C.F.R. § 648.102(c)(1)(i). Past that point, the 2020 Allocation Rule subjects any additional catch to a new, evenly divided, "surplus" quota—by which every state receives approximately 12% of any additional catch during a good fishing year.[3] *See id*. § 648.102(c)(1)(ii). Consequently, under the 2020 Allocation Rule, New York is entitled to its historical 7% of the first 9.55 million pounds of coastwide catch, and 12% of any surplus beyond that.

New York filed comments regarding the 2020 Allocation Rule; it protested that it should receive a higher quota percentage because summer flounder populations had relocated closer to its own shores. New York claimed that the NMFS had ignored scientific evidence showing the summer flounder movement.

---

[3] The exceptions are Maine, New Hampshire, and Delaware, who receive only a *de minimis* amount of the surplus quota. These three states do not participate substantially in the summer flounder catch.

7

The NMFS rejected New York's comments and explained why the quotas crafted in the 2020 Allocation Rule were preferrable.

After the NMFS finalized the 2020 Allocation Rule, New York filed this action against the NMFS and related federal entities. New York maintained its argument that the 2020 Allocation Rule, as well as annual implementation rules promulgated thereunder,[4] fail to account for the summer flounder's long-term relocation. New York claimed that by doing so, the NMFS disregarded four of the MSA's ten national standards—which required the agency to use the "best scientific data available" and to promote efficiency and fairness among fishermen.

The United States District Court for the Southern District of New York (Vyskocil, *J.*) denied New York's motion for summary judgment and granted the defendants' cross-motion. The district court concluded it was "clear from the administrative record that NMFS appropriately considered all the ten national standards and, in exercising its discretion to formulate the 2020 Allocation Rule,

---

[4] Each year, NMFS adopts a "Specifications Rule," which announces that year's coastwide quota and then, based on the 2020 Allocation Rule, calculates the distribution of that quota among the states. *See* 50 C.F.R. § 648.102(c). New York has also challenged the most recent Specifications Rule, but the parties agree that the validity of the 2020 Allocation Rule will determine the validity of any derivative Specifications Rule. *See New York v. Raimondo*, 594 F. Supp. 3d 588, 597 (S.D.N.Y. 2022).

8

did not violate the MSA." *New York v. Raimondo*, 594 F. Supp. 3d 588, 599 (S.D.N.Y. 2022). New York appealed.

## DISCUSSION

### A. Standard of Review

"On appeal from a grant of summary judgment involving a claim brought under the [APA], we review the administrative record *de novo* without according deference to the decision of the district court." *Town of Southold v. Wheeler*, 48 F.4th 67, 77 (2d Cir. 2022) (quoting *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007)). Nevertheless, our review in this case is narrow, and deferential to the NMFS's expertise as an agency. *See id.* That is because MSA provides that courts review NMFS rulemakings under the APA's arbitrary and capricious standard. *See* 16 U.S.C. § 1855(f). Under that standard, an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (citation and internal quotation marks omitted); *see* 5 U.S.C. § 706(2)(A).

9

## B.     Validity of the 2020 Allocation Rule

Fishery management plans "shall be consistent with" the MSA's ten national standards.  16 U.S.C. § 1851(a).  Those standards are:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States.  If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

*Id*.

The ten national standards encompass disparate concerns. There is, consequently, a "necessary tension" among them. *All. Against IFQs v. Brown*, 84 F.3d 343, 349–50 (9th Cir. 1996). The national standards' expansive text and structure reflect that Congress intended for the NMFS to use "discretion and judgment" to reconcile this tension when managing the fishery. *Id*. The MSA gives the NMFS rulemaking flexibility to react to dynamic natural conditions and account for multiple stakeholders. One national standard does not trump the others; incremental adjustments to a fishery management plan are acceptable. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 524 (2007).

11

**C.     Validity of the 2020 Allocation Rule**

New York contends that by failing to allocate a higher quota to New York, the 2020 Allocation Rule ignores the northward movement of the summer flounder population and is therefore inconsistent with National Standards 2, 4, 5, and 7.

**i.     National Standard 2: Best Scientific Information Available**

National Standard 2 provides that "[c]onservation and management measures shall be based upon the best scientific information available."  16 U.S.C. § 1851(a)(2).  New York ties its appeal to National Standard 2 and notes that the NMFS acknowledged that the "best scientific information available" showed summer flounder populations had shifted northward toward New York.  In New York's view, its quota must therefore reflect its increased proximity to the summer flounder populations.  New York argues that by keeping each state's baseline quota unchanged from the 1993 Allocation Rule, and by evenly splitting each state's surplus quota during good fishing years, the 2020 Allocation Rule is not "based upon" the recent concentration of summer flounder near New York and other northern states.

12

We disagree. New York is correct that the phrase "based upon" implies the agency must use (and not merely consider) the location of summer flounder populations when crafting the fishery management plan. "In its plain meaning, 'based on' means 'having as the foundation' or 'arising from.'" *Env't Def. v. E.P.A.*, 369 F.3d 193, 203 (2d Cir. 2004). However, the agency did use these fish location data. The new surplus quotas in the 2020 Allocation Rule are based, to some degree, on the northward movement of summer flounder. As the NMFS explained, the surplus quotas are meant to "generally" shift fishing rights during good fishing years. 85 Fed. Reg. at 80,663. They "reduce the proportion of quota for states at the southern end of summer flounder distribution (North Carolina, Virginia, and New Jersey) and increase allocation for many northern states, including New York." *Id*. New York's quota increases from 7% to 12% during surplus periods, while states now farther away from the summer flounder see corresponding decreases in their quotas. The agency explained that it introduced the surplus quotas to "reflect[] the shift of the center of summer flounder biomass." *Id*. Accordingly, the 2020 Allocation Rule is "based upon" the shifted location of the summer flounder—and New York can catch a higher percentage of fish under

13

the current rule than the previous rule—just not to a degree that New York would prefer.

Moreover, the NMFS can base its rule upon multiple sets of "scientific information." The MSA does not restrict National Standard 2 to encompass fish location data alone; other types of scientific information may merit greater consideration.[5] Here, the primary data that the NMFS employed were landings data: statistics showing which fishing communities landed summer flounder in previous years. New York does not dispute that landings data have remained the same since the 1993 Allocation Rule, or that landings data remain the "best" information available to determine which fishing communities depend on the summer flounder today. NMFS has prioritized landings data over fish location data when allocating state quotas. That is a choice rooted in the agency's technical expertise—for which it enjoys substantial deference. *See Env't Def.*, 369 F.3d at 204.

---

[5] The MSA requires the Secretary of Commerce to establish advisory guidelines based on the national standards. These guidelines lack the force of law but "assist in the development" of fishery management plans. 16 U.S.C. § 1851(b). For National Standard 2, the guidelines state that scientific data should include "biological, ecological, environmental, economic, and sociological scientific information." 50 C.F.R. § 600.315(a). Historical data, such as landings data, may be useful so long as they are "evaluated for [their] relevance to inform the current situation." *Id.* § 600.315(a)(6)(v)(B).

### ii.  National Standards 4, 5, and 7: Fairness and Efficiency

New York also contends the 2020 Allocation Rule violates National Standards 4, 5, and 7.  National Standard 4 provides that "[c]onservation and management measures shall not discriminate between residents of different States" and that allocation of fishing privileges shall be "fair and equitable to all such fishermen."  16 U.S.C. § 1851(a)(4).  National Standards 5 and 7 call for such measures, "where practicable," to "consider efficiency in the utilization of fishery resources" and to "minimize costs and avoid unnecessary duplication."  *Id*. §§ 1851(a)(5), (7).  Similar to its previous argument, New York says it is unfair and inefficient to allocate higher quotas to states that are farther away from summer flounder populations.

We disagree with this argument as well.  The NMFS articulated why it balanced the national standards the way it did, and why it rejected the location-based rule that New York seeks.  Regarding the fairness and equity concerns in National Standard 4, the NMFS explained why it found it would be unfair to reduce baseline quotas for communities in states who have become economically dependent, over time, on fishing for summer flounder.  In doing so, the NMFS explicitly balanced National Standard 4 against National Standard 8, which

15

requires management measures to "take into account the importance of fishery resources to fishing communities" and "minimize adverse economic impacts on such communities" where practicable. 16 U.S.C. § 1851(a)(8). By including ten standards, the MSA contemplates that other fishery management considerations— here, the inertia of fishing industries established over decades—can outweigh equitability concerns that flow from the transitory movement of the summer flounder. "The [NMFS] is allowed, under this authority, to sacrifice the interests of some groups of fishermen, for the benefit as the [NMFS] sees it of the fishery as a whole." *All. Against IFQs*, 84 F.3d at 350.

As for the efficiency and cost concerns in National Standards 5 and 7, the NMFS reasoned that southern states' operations involve longer trips and larger vessels built in reliance on their higher quotas. A location-based rule, the agency explained, would ignore the "substantial variability in the mobility of each state's fleet" and the "traditional areas of operation for each state's fleet." 85 Fed. Reg. at 80,663. Put differently, it would not necessarily be efficient for a southern state to scrap its existing (longer-range) fleet just for a northern state to expand its (shorter-range) fleet. That is a policy judgment the agency was entitled to draw based on

16

the landings data it reviewed.  *See F.C.C. v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

*   *   *

The NMFS adopted a rule that sought to "balance preservation of historical state access and infrastructure at recent quota levels, with the intent to provide equitability among states when the stock and quota are at higher levels."  85 Fed. Reg. at 80,663.  We cannot say that this adjustment to the previous rule—the result of balancing ten different national standards—lacked a rational basis articulated in the administrative record.  *See State Farm*, 463 U.S. at 43.  We therefore conclude the NMFS did not violate the MSA or the APA when it set summer flounder quotas through the 2020 Allocation Rule.

## CONCLUSION

We have considered New York's remaining arguments and find them to be without merit.  Accordingly, we **AFFIRM** the judgment of the district court.