# In the
# United States Court of Appeals
## For the Seventh Circuit

―――――――

No. 03-2690

WILLIAM HUDSON and BISHOP PAMON,

*Plaintiffs-Appellants*,

v.

CITY OF CHICAGO,

*Defendant-Appellee.*

―――――――

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 1129—**David H. Coar**, *Judge.*

―――――――

ARGUED FEBRUARY 23, 2004—DECIDED JULY 6, 2004

―――――――

Before BAUER, EASTERBROOK, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Plaintiffs William Hudson and Bishop Pamon, former police officers with the Chicago Police Department, brought suit under 42 U.S.C. § 1983 against the City of Chicago. Hudson and Pamon claim that when the Department terminated their employment pursuant to an "absent without permission" ("AWOP") policy, the City (through the Department) failed to provide them with due process of law. The district court granted summary judgment to the City, and we affirm.

## I. History

As officers in the police department whose "appointment[s] ha[d] become complete," Hudson and Pamon could only be fired "for cause." *See* 65 Ill. Comp. Stat. 5/10-1-18.1 (2001); Chicago, Ill., Code § 2-84-030 (2001). At all times relevant to this case, a collective bargaining agreement ("CBA") governed the employment relationship of police officers and the City. All officers receive a copy of the CBA.

Under article 23, section 23.1(D) of the CBA, the employment relationship between a police officer and the Department is terminated if the officer is AWOP for four consecutive days. The commanding officer of the AWOP officer's unit submits a form, known as a Personnel Action Request ("PAR"), along with any accompanying documentation, to the personnel division, specifying the days the officer was absent and requesting termination. Once personnel receives this information, an administrative sergeant calls the officer's district to confirm that the officer was indeed AWOP for four days. The commanding officer in personnel then signs off on the termination. Finally, the personnel department sends a letter to the AWOP officer; the letter purports to accept the "resignation" of the officer.

The CBA does not formally afford an officer a pre-termination hearing to contest a termination under the AWOP policy because the Department considers a four-day AWOP violation to constitute job abandonment. However, the City asserts that, in practice, the Department allows an officer an opportunity to be heard on an AWOP termination before a final decision is made. The CBA does contain extensive provisions that detail a post-deprivation grievance procedure for disputes between the parties concerning interpretation or application of the CBA.

If an officer must miss work for any reason, Department policy demands that the officer account for his or her whereabouts. An officer may use accrued personal time to

be paid for missed days. If the officer does not have any personal time accrued, the officer must either provide daily notice to the district timekeeper of the reason he or she is not at work, or apply for and obtain an unpaid leave of absence (thus obviating the need to call in each day).[1] In two unrelated incidents, Hudson and Pamon were, according to the city, AWOP for at least four days. They were subsequently fired.

After contesting these terminations with the Department (as described in detail below), Hudson and Pamon eventually filed suit against the City. The district court, finding that both men had been afforded all the process they were constitutionally due, granted summary judgment to the City.

## A. Hudson

In the autumn of 2000, Hudson worked out of the Department's 18th District. After an early October incident involving allegations of domestic violence, the Department placed Hudson on paid leave pending an investigation. Before this investigation concluded, however, Hudson was arrested for domestic battery on January 26, 2001. As a condition of his release on bond, Hudson was not allowed to use or possess any firearms.[2]

---

[1] There are some indications in the record that the *only* acceptable way for an officer to avoid AWOP status after exhausting his or her personal time is to take a leave of absence. The briefs, the district-court opinion, and other evidence in the record assume that both options were available to Hudson and Pamon, however, and we will do likewise.

[2] Hudson was found not guilty of the charge of domestic battery on June 18, 2001, and was released from the condition of the bond at that time.

On February 2, 2001, Hudson met with Sergeant Raymond Gawne at the Department's personnel division. Because Department policy requires officers to carry firearms, and Hudson no longer could as a condition of his release, Hudson's police powers were suspended and he was placed on no-pay status. Gawne told Hudson that he needed to call his district every day to inform them of his status. Hudson understood he could continue to receive paychecks if he used his accumulated personal time until it was exhausted; to do so, he had to call in each day to his district and inform them what type of personal time he wished to use that day.[3]

After meeting with Gawne, Hudson called the district timekeeper each day to apply his personal time to his work schedule. On March 18, 2001, Hudson exhausted all of his personal time. Unsure what to do, Hudson asked the district timekeeper for advice. The district timekeeper, also unaware of the proper procedures, referred Hudson to the watch commander; he, in turn, referred Hudson to the district commander, Commander Griffin. Hudson scheduled a meeting with Griffin through Griffin's secretary but failed to contact the commander by telephone or inquire elsewhere about what to do (it does not appear that Hudson and Griffin met before Hudson received his termination letter). On March 19, 20, 21, and 22, Hudson did not call in to

---

[3] The parties disagree as to whether Gawne informed Hudson of the procedures to follow once his personal time was exhausted, although Gawne insists that the information must have been provided. Gawne read from a "checklist" form during the meeting. The checklist included information about the AWOP policy, calling in to the district each day, and the leave of absence policy. This checklist is in the record, has Hudson's name at the top, is dated February 2, 2001, and has a mark next to each of the paragraphs that include, among other information, the items noted above. (R. 20, Ex. 7).

account for his absence, nor did he apply for an unpaid leave of absence, the two options available to him under Department policy to avoid being considered AWOP. Hudson attributes this failure to ignorance; the procedures are not provided in the CBA, and Hudson denies that Gawne informed him of his options at their meeting.

After recognizing Hudson's AWOP status, the 18th District compiled, in accordance with Department policy, PAR forms detailing each day Hudson was AWOP. Griffin submitted the PAR forms and a memorandum to the personnel division. After Gawne processed the forms, he obtained a signed letter from Commander Powers, the head of the personnel division, and sent this letter to Hudson some time after March 22, 2001. The letter informed Hudson that he was in violation of the AWOP policy and that the Department accepted his "resignation" effective March 22.

Upon receiving the termination letter, Hudson contacted Gawne and insisted that a mistake had been made. Gawne suggested that Hudson should contact his commander, Griffin, and explain why the termination was a mistake. Griffin requested a memorandum from Hudson, which Hudson submitted on April 11, 2001. In it, Hudson claimed he was not aware of the Department policy that required him to request a leave of absence or call his timekeeper every day to explain his absence after his personal time was exhausted. Hudson requested a hearing or an evaluation of the incident. The Department reviewed this memorandum; on June 8, 2001, Commander Powers sent Hudson a letter indicating that the Department would not change its decision. The letter offered Hudson the opportunity to submit any additional information he wished. Instead, Hudson hired an attorney. The attorney requested that the Department reinstate Hudson; that request was declined. Hudson testified that he contacted the Union, but it refused

to file a grievance on his behalf. Hudson filed suit against the City on February 15, 2002.


### B.  Pamon

In 2001, Pamon worked at the Department's 21st District. In the fall of 2001, Pamon began to plan an extended leave from the Department. Using his twenty-five days of authorized furlough, Pamon, on November 16, requested off for the month of January 2002. In addition, Pamon planned to submit a request for a "furlough extension" through February 26; officers may use any accumulated personal time to extend their leave with the approval of supervisors. On the last day of work before Pamon started his furlough, December 28, 2001, he requested the furlough extension by placing his request sheet and time slips in his supervising sergeant's in-basket.

Although the Department had never rejected Pamon's furlough-extension requests in the past, Pamon's watch commander, Captain Eugene Roy, denied Pamon's February furlough extension. He did so because Pamon had failed to comply with Department procedures for obtaining the extension—Pamon had placed it in a basket rather than discussing the matter personally with a watch commander (Roy had been on furlough himself until January 1, but Pamon should have talked to one of his replacements). Roy attempted to contact Pamon by telephone throughout the month of January. He also tried to inform Pamon that his furlough was denied by issuing a January 28 letter to Pamon's address of record. Finally, Roy added a note to Pamon's February 1 paycheck, requesting Pamon contact him. Despite personally picking up the check and seeing the note, Pamon did not contact Roy or otherwise inquire into his furlough status.

After Pamon's approved furlough ended on February 1, his unit continued to attempt to determine Pamon's where-

abouts. Unable to find or communicate with him, the watch commander finally ordered that Pamon be noted as AWOP on February 13. Pamon failed to go to work or give notice to his district on February 13, 14, 15, and 19. The 21st District filled out PAR forms and sent them to the personnel division.

Pamon finally contacted Captain Roy on February 25, 2002. Roy, Pamon, and the desk sergeant met the next day. Pamon explained why he had taken the extended time and why he was out of contact—he had been traveling back and forth to the South to care for sick friends. Pamon expressed his desire to keep his job at this meeting. Shortly thereafter, however, Commander Powers sent Pamon a letter advising him that his employment was being terminated because of his unauthorized absence. Pamon met with Jim O'Leary, an officer of the Union; O'Leary explained that the Union would not proceed on Pamon's behalf. On May 30, 2002, Pamon joined Hudson's lawsuit.

## II.  Analysis

We review de novo the district court's decision to grant summary judgment and, in doing so, consider the evidence in the light most favorable to the nonmoving party. *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 705 (7th Cir. 2002). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The Due Process Clause of the Fourteenth Amendment forbids a state from depriving any person of "life, liberty, or property, without due process of law." To demonstrate a procedural due process violation, the plaintiffs must establish that there is "(1) a cognizable property interest; (2)

a deprivation of that property interest; and (3) a denial of due process." *Buttitta v. City of Chicago*, 9 F.3d 1198, 1201 (7th Cir. 1993).

The City, for purposes of this appeal, appropriately concedes that non-probationary Chicago police officers like Hudson and Pamon have a property interest in their continued employment. *See* 65 Ill. Comp. Stat. 5/10-1-18.1 (2001); Chicago, Ill., Code § 2-84-030 (2001)*; see also Confederation of Police v. City of Chicago*, 547 F.2d 375, 376 (7th Cir. 1977) ("[T]he existence of a property interest in public employment cognizable under the due process clause depends on whether state law has affirmatively created an expectation that a particular employment relationship will continue unless certain defined events occur."). The City also concedes on appeal that the Department deprived the Plaintiffs of their property interest, abandoning the argument made below that Hudson and Pamon "constructively resigned" from their jobs. *Cf. Lindsey v. Baxter Healthcare Corp.*, 962 F.2d 586, 588-89 (7th Cir. 1992) (defining this "legal fiction"). Thus, the sole issue on appeal is whether the Department satisfied the constitutional demands of due process in depriving Hudson and Pamon of their employment.

Due process "is not a technical conception with a fixed content unrelated to time, place[,] and circumstances[;]" instead, it "is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (citations omitted). The process constitutionally required is determined by balancing three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.

*Gilbert v. Homar*, 520 U.S. 924, 931-32 (1997) (quoting *Mathews*, 424 U.S. at 335); *see also Sonnleitner v. York*, 304 F.3d 704, 712-14 (7th Cir. 2002); *Wallace v. Tilley*, 41 F.3d 296, 300 (7th Cir. 1994).

As long as substantial post-deprivation process is available, the pre-deprivation process required when terminating an employee often need not be elaborate or extensive. Rather, in many situations, it "should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action[;] . . . [the] pre-termination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." *Gilbert*, 520 U.S. at 929 (internal citations and quotations omitted). We will explore separately the Plaintiffs' claims that the Department's pre- and post-deprivation procedures failed to satisfy the demands of the Constitution.

## A.  Pre-Deprivation Process

We evaluate the Plaintiffs' pre-deprivation due process claims, as stated above, by applying the three-factor balancing test employed by the Supreme Court.

### 1.  The private interest

The loss of a job is an extremely significant deprivation. Some form of pre-termination notice and hearing is generally required under the due process clause when a municipality fires an employee with a property interest in their employment. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542-45 (1985). Often, this gives an employee an opportunity to contest the factual basis for a termination. But "[e]ven where the facts are clear, the appropriateness

or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect." *Id.* at 543. Thus, the first factor—the employee's private interest in the right—weighs in favor of pre-deprivation due process.

### 2. The Risk of an Erroneous Deprivation and the Value of Procedural Safeguards

In spite of the unquestioned strength of the private interests affected in this case, the City nonetheless argues for a per se rule that no pre-termination process should be required to fire AWOP police officers. The City first suggests that there is no possibility of an erroneous deprivation because of the Department's system of procedural checks. These procedures, including the submission of a detailed PAR form and a phone call verification by an administrative sergeant in the personnel division, are intended to assure the Department that the factual basis of the AWOP termination is correct. Second, the City insists that pre-termination procedures would be valueless because the mandatory language of the CBA (the "employment relationship shall be terminated") eliminates the possibility that discretion will be exercised in favor of an AWOP officer.

Contrary to the City's assertions, a pre-termination notice and hearing could avoid harmful mistakes and provide value to both the officers and the Department. Even the best bureaucrats occasionally make mistakes. Maybe an officer could present evidence that a clerical error occurred that led to false PAR forms and AWOP confirmation (indeed, Sergeant Gawne was concerned with just such an error upon hearing from Hudson after Hudson received the termination letter). Or perhaps the individual in the AWOP officer's unit in charge of sending the PAR forms held a grudge against the officer and fraudulently misinformed the

personnel division. To avoid mistakes, it is of fundamental importance that the individual with the most at stake, the AWOP officer, be given an opportunity to explain why he should not be terminated.

If the facts were undisputed and the punishment truly automatic, this might be a circumstance in which no pre-termination process was required. *See Loudermill*, 470 U.S. at 543 n.8 (noting that a person may not "insist on a hearing in order to argue that the decisionmaker should be lenient and depart from legal requirements"); *Dixon v. Love*, 431 U.S. 105, 113-14 (1977) (concluding that additional procedures were unnecessary because the factual basis for taking away the plaintiff's driver's license was undisputed, and the state authorities would have had to depart from binding regulations to change the decision). But Hudson's and Pamon's demands for pre-termination process are not necessarily a mere plea for leniency. Hudson could sensibly argue that the AWOP policy was not intended to apply to an officer who had been ordered by the Department to stay away from work. And Pamon could point to a good-faith belief that his furlough-extension application was approved, as it had been in the past.

Furthermore, despite the protestations of the City to the contrary, the facts of this case demonstrate that the system allows for the exercise of discretion in applying the AWOP policy. First, Pamon was due back at work on February 1, 2002, but he was nevertheless not counted as AWOP until February 13. Second, as Hudson's and Pamon's facts make clear, the Department allows an officer to be heard on the officer's AWOP termination before a final decision is made, even though such process is not a formal policy. After meeting with Commander Griffin, Hudson submitted a memorandum to him, explaining why he had not complied with the notification requirements and claiming he was not aware of them. Similarly, Pamon met with Captain Roy and tried to convince Roy that he should not be terminated.

Surely there is some explanation that would have convinced the Plaintiffs' superiors that they should not be terminated, or else why did Griffin, Roy, and Powers even bother hearing from Hudson and Pamon? As we can find no reason to infer that the Plaintiffs' supervisors allowed Hudson and Pamon to contest their termination simply as an empty charade, then we can conclude the inverse: these informal hearings provided the Plaintiffs with a genuine opportunity to avoid termination. Hence, the second factor weighs in favor of a pre-deprivation hearing.

### 3.  The Government's Interest

Finally, the City points to the government's strong interest in quickly removing and replacing AWOP officers to adequately provide for public safety, without conducting a lengthy search for the officer or holding a hearing that would primarily serve to delay this action. A strong interest exists in allowing an organization devoted to public safety to swiftly replace workers who refuse to show up to work. Thus, the third factor cuts in favor of allowing minimal or no pre-termination process.

### 4.  Balancing the Factors

Balancing each of the three factors demonstrates that the Department is required, to the extent that the AWOP officers can be contacted through a reasonable effort such as a phone call or a letter, to notify the officers and offer them an opportunity to justify or otherwise challenge their unexplained absences before finalizing a termination under the policy. In tailoring due process requirements to the particular circumstances of this case, the strength of Hudson's and Pamon's interest in continued employment outweighs the public's interest in having easily administered rules to dismiss AWOP officers. A pre-termination hearing is

valuable to officers like Hudson and Pamon because they can invoke the discretion of the Department before it commits to a final decision.

As aforementioned, police departments, as a matter of public policy, need to ensure that officers show up for work or are accounted for so an adequate force is available to maintain public safety. *See, e.g., Gilbert*, 520 U.S. at 932-36 (holding that a police officer, charged with felony drug charges, could be temporarily *suspended* without pay despite the lack of a pre-deprivation hearing); *Jones v. City of Gary*, 57 F.3d 1435, 1436-39 (7th Cir. 1995) (holding that the fire department chief could *suspend* without pay a firefighter who unambiguously refused to return to work despite the lack of a pre-deprivation hearing because of the powerful public and governmental interest in maintaining a full roster of firefighters as well as the unlikelihood that the suspensions were mistaken because of multiple prior evaluations of the firefighter's disability claims). Therefore, the City may well be justified in suspending AWOP officers without pay pending a post-deprivation hearing.

But there are important differences between a temporary suspension and termination, a permanent deprivation. Unlike termination, a suspension provides "ample opportunity to invoke discretion later—and a short delay actually benefits the employee by allowing state officials to obtain more accurate information about the [incident that led to the suspension]." *Gilbert*, 520 U.S. at 934-35; *see also Luellen v. City of East Chicago*, 350 F.3d 604, 614-16 (7th Cir. 2003) (holding that the city was entitled to place a fire inspector on administrative leave without a pre-deprivation hearing when he had been arrested and charged with a crime). The "expeditious removal of unsatisfactory employees and the avoidance of administrative burdens" does not justify terminating an employee without pre-deprivation notice and an opportunity to respond. *Loudermill*, 470 U.S.

at 542-44. Consequently, we decline to permit *dismissals* pursuant to the AWOP policy without any pre-termination process in this case.

Indeed, Hudson and Pamon did receive process before final termination in the form of the informal hearings (i.e., the memorandum to Griffin and the meeting with Roy, respectively). But the question remains whether Hudson and/or Pamon received *adequate* pre-termination process. Here, in light of the fact that substantial post-deprivation process is available in the form of the CBA grievance procedures, "pre-termination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." *Gilbert*, 520 U.S. at 929.

We conclude that Hudson and Pamon did in fact receive adequate pre-deprivation process. After receiving the letter that notified him that the Department considered his AWOP status a resignation, Hudson, already on no-pay status because of his legal difficulties, immediately contacted Gawne and was given the opportunity to submit a memorandum to Commander Griffin, explaining why the AWOP firing was a mistake. The Department, before making a final decision on termination, considered this information, but stuck with its initial assessment. Hudson did not take up the offer in the Department's June 8, 2001 letter confirming his termination to submit more information for consideration.

Pamon also had an opportunity to present his side of the story, meeting with Captain Roy after he learned that the Department had deemed him AWOP.[4] Simply because the

---

[4] Pamon was out of contact for several days after his four-day AWOP status was finalized. Unlike Hudson, he could not be immediately notified, but because the Department in fact waited for

(continued...)

Department did not change its position after these hearings does not alter our finding that a hearing was held after the officers had notice of their impending termination.[5]

## B. Post-Deprivation Process

Grievance procedures created by collective bargaining agreements can satisfy the requirements of due process for terminated employees. *See, e.g., Buttitta*, 9 F.3d at 1206 (holding that the post-deprivation grievance procedure available to Chicago police officers under their collective bargaining agreement satisfied due process); *Winston v. United States Postal Serv.*, 585 F.2d 198, 209-10 (7th Cir. 1978) (holding that the multi-step grievance procedure for postal workers satisfied due process).

The CBA includes a grievance procedure for police officers to utilize. An officer wishing to challenge a Department decision must first submit a grievance to the officer's immediate supervisor in his or her assigned unit within seven working days of the event giving rise to the grievance, or within seven days following the officer's first knowing of the events leading to the grievance. The supervisor must then respond to the grievance within seven working days. The supervisor subsequently presents the grievance to the

---

[4] (...continued)
Pamon to tell his side of the story, there is no need in this case to definitively answer the extent of effort required to give an officer actual notice. We emphasize, however, that public employers should not be expected to track down wayward employees.

[5] We are troubled by the lack of a regularized process whereby Chicago police officers may receive notice and a minimal hearing before being finally terminated under the AWOP policy. We reassert, however, that Hudson and Pamon each received adequate pre-termination procedural protections and that is all that this case decides.

commanding officer of the unit. Next, the commanding officer must render a written decision within fourteen days of receiving the grievance. The officer and the Union may request mediation if they are not satisfied with the outcome. If all else fails, the matter may be submitted to arbitration for an interpretation of the meaning and application of the CBA.

Neither Hudson nor Pamon filed a grievance pursuant to the CBA, and therefore neither Plaintiff participated in the post-deprivation grievance process. "[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them." *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982). Although the Union allegedly refused to initiate grievance proceedings on the Plaintiffs' behalf, this does not affect the analysis of whether the City violated the due process rights of Hudson and Pamon. Plaintiffs argue that the CBA does not allow individuals to initiate grievance proceedings for AWOP terminations on their own. Even if this is true (the City insists that individuals may bring grievances on their own), the Plaintiffs could have sued the Union for breach of its duty to fairly represent their interests—the City should not be blamed for the mistakes of the Union. *See Winston*, 585 F.2d at 210. The CBA provides adequate post-deprivation due process. We therefore agree with the district court's finding that the Plaintiffs' due process rights have not been violated.

As a side note, we summarily reject the Plaintiffs' contentions that their rights to due process were violated because the Department allegedly did not comply with procedures demanded by Illinois state law. "[T]he failure to conform with the procedural requirements guaranteed by state law does not by itself constitute a violation of federal due process." *Martin*, 295 F.3d at 706-07 (citing *Pro-Eco, Inc. v. Bd. of Comm'rs of Jay County, Ind.*, 57 F.3d 505, 514

(7th Cir. 1995); *Wallace v. Tilley*, 41 F.3d 296, 301 (7th Cir. 1994); *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993)).

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*