In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-2254

RYAN CLANCY,

*Plaintiff-Appellant*,

*v.*

OFFICE OF FOREIGN ASSETS CONTROL OF THE
UNITED STATES DEPARTMENT OF THE TREASURY,
TIMOTHY F. GEITHNER, Secretary, United States
Department of Treasury, in his official capacity,
ADAM J. SZUBIN, Director, Office of Foreign Assets
Control, in his official capacity, and ERIC H. HOLDER, JR.,
Attorney General, United States Department of Justice,
in his official capacity,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05 C 580—**Rudolph T. Randa**, *Chief Judge*.

ARGUED FEBRUARY 11, 2008—DECIDED MARCH 11, 2009

Before BAUER, KANNE, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Having declared a national
emergency to deal with the threat of Iraq in 1990, President

George H. W. Bush imposed economic sanctions prohibit-
ing unauthorized travel to Iraq and authorized the Trea-
sury Department's Office of Foreign Assets Control
("OFAC") to promulgate regulations in accordance
with those executive orders. In 2003, Clancy traveled to
Iraq in violation of those regulations and was fined $8,000
by OFAC. Clancy challenged OFAC's regulations on a
number of statutory and constitutional grounds, first in
a written submission to OFAC and then in federal court.
The district court granted summary judgment to the
defendants, and Clancy now repeats all of his arguments
on appeal. None has any merit.

We first reject Clancy's claim that he was fined without
due process. Clancy was given the opportunity to make a
written submission (which he did) and to contest OFAC's
allegations regarding his unauthorized travel to Iraq
(which he did not). Because Clancy is unable to explain
how additional or substitute procedures would have
guarded against any risk of erroneous deprivation, we
are not convinced that additional procedures are con-
stitutionally required.

Next, in light of Supreme Court case law regarding the
President's power to impose economic sanctions and
international travel restrictions during national emergen-
cies, we are not persuaded that the regulations violate
Clancy's Fifth Amendment right to travel or First Amend-
ment right to free speech. *See Regan v. Wald*, 468 U.S. 222,
242 (1984); *Haig v. Agee,* 453 U.S. 280, 309 (1981). We also
reject Clancy's argument that the regulations are ultra
vires, as both the United Nations Participation Act and the

Iraq Sanctions Act authorized the President to impose travel restrictions to Iraq. Nor does the International Covenant on Civil and Political Rights, an international agreement that does not address any right to travel that might conflict with these regulations, provide any relief for Clancy. And finally, we do not find arbitrary or capricious OFAC's interpretation of the word "services" to encompass Clancy's actions as a "human shield" in Iraq. Therefore, we affirm the grant of summary judgment in the defendants' favor.

## I. BACKGROUND

In the summer of 1990, Iraq attacked Kuwait. Announcing that the policies and actions of the Government of Iraq constituted a threat to the national security and foreign policy of the United States, President George H. W. Bush declared a national emergency. Pursuant to his authority under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 ("IEEPA"), President Bush imposed unilateral economic sanctions that prohibited, *inter alia*, the export of services to Iraq and all transactions relating to travel to Iraq. *See* Exec. Order No. 12722, 55 Fed. Reg. 31803 (August 2, 1990). Shortly thereafter, the United Nations Security Council adopted Resolution 661, which called upon all states to prevent their nationals and any persons within their territories from remitting any funds to persons or bodies within Iraq. In accordance with that resolution, President Bush issued Executive Order 12724 which, like Executive Order 12722, prohibited "[a]ny transaction by a United States person relating to travel by

any United States citizen . . . to Iraq, or to activities by any such person within Iraq." Exec. Order No. 12724, 55 Fed. Reg. 33089 (August 9, 1990).

A few months later, in November 1990, Congress passed the Iraq Sanctions Act, which declared support for the President's actions and for "the imposition and enforcement of multilateral sanctions against Iraq." Iraq Sanctions Act, Pub. L. 101-513 § 586, 104 Stat. 1979, 2047-48 (1990). It directed the President to "continue to impose the trade embargo and other economic sanctions with respect to Iraq and Kuwait . . . pursuant to Executive Orders Numbered 12724 and 12725 (August 9, 1990) and, to the extent they are still in effect, Executive Orders Numbered 12722 and 12723 (August 2, 1990)." *Id.*

President Bush authorized the Secretary of the Treasury to take actions necessary to carry out the purposes of the Orders. So the Treasury Department's Office of Foreign Assets Control ("OFAC") promulgated regulations that (in relevant part) restricted unauthorized trade, transportation-related transactions, the exportation of services, and financial transactions with Iraq. 31 C.F.R. §§ 575.204-211; 31 C.F.R. §§ 575.702-704. Specifically, the regulations prohibited any "U.S. person" (with the exception of journalists and government officials) from engaging in "any transaction relating to travel" to Iraq, and also prohibited "the unauthorized payment by a U.S. person of his or her own travel or living expenses to or within Iraq." 31 C.F.R. § 575.207. 31 C.F.R. § 575.205 provides that "no goods, technology . . . or services may be exported from the United States [to Iraq]."

The regulations cite several sources of authority, including the Executive Orders, the IEEPA, and the United Nations Participation Act, 22 U.S.C. § 287c(a) ("UNPA"). We note that although the President eventually revoked Executive Orders 12722 and 12724, the orders were in effect at all times relevant to this case.

Violations of these regulations are punishable by monetary penalties. If OFAC has reasonable cause to believe a person has violated these regulations, it must first issue a "pre-penalty notice" stating the facts of the violation and notifying the person of her right to make a written presentation as to why a monetary penalty should not be imposed. 31 C.F.R. § 575.702. Any such presentation "should contain responses to the allegations in the pre-penalty notice and set forth the reasons why the person believes the penalty should not be imposed or, if imposed, why it should be in a lesser amount than proposed." 31 C.F.R. § 575.703. After considering the relevant materials, OFAC notifies the person in writing of its determination. *Id.* § 575.704.

Clancy, an American citizen and resident of Wisconsin, traveled to Iraq in violation of the regulations. According to OFAC's administrative record, he departed for Iraq on January 28, 2003. He never sought authorization for his travel. He went to protest the war and act as a "human shield" for the "human shield movement," which he had discovered through its website, www.humanshields.org. The goal of this organization was to prevent the United States from bombing Iraq. While in Iraq, Clancy stayed at the Andalus Apartments (a hotel in Baghdad, Iraq), and at a food storage facility north of Baghdad.

Clancy returned to the United States on March 7, 2003. Upon his return, he was stopped and interviewed by a United States customs official. (Clancy had declared on his customs form that he had traveled to Iraq, and his passport bore Iraqi stamps.) According to the report of the customs official, Clancy told the customs official that he traveled to Iraq to protest the war and act as a human shield for the human shield movement, which involved staying at food storage facilities and schools in an attempt to deter the United States from bombing those locations.

A few weeks later, the United States invaded Iraq.

On July 8, 2004, OFAC issued Clancy a Pre-Penalty Notice ("PPN") charging Clancy with the following violations:

> On January 28, 2003, you departed the United States with an ultimate destination to Baghdad, Iraq. The cost of the transportation totaled £300, including ground transportation between Amman, Jordan and Baghdad. You arrived in Iraq on or around February 5, 2003, where you stayed in the Andalus Apartments, a hotel in Baghdad, and a food storage facility 30 to 40 minutes north of Baghdad. While in Iraq, you provided services by shielding Government of Iraq facilities from possible U.S. military action. You returned to the United States on March 7, 2003.

The PPN provided the various laws and regulations that governed Clancy's actions and informed him that he could be assessed a civil penalty of $250,000 for each

violation. It informed Clancy that he had thirty days to make a written presentation to OFAC responding to the allegations in the PPN. The PPN was signed by R. Richard Newcomb, a director of OFAC.

With the assistance of counsel, Clancy submitted a written presentation to OFAC on August 23, 2004. Clancy declined to waive his Fifth Amendment privilege and stated that for the purpose of his response only, he would accept as true the allegations that he departed the United States for Iraq on January 28, 2003, and that he returned to the United States on March 7, 2003. He did not admit or deny OFAC's remaining allegations. Clancy then made a lengthy legal argument challenging the validity of the regulations and their application to him. He did not dispute the allegation that he stayed at a hotel in Baghdad and a food storage facility north of Baghdad.

OFAC issued a final penalty notice to Clancy, finding that he had violated the regulations as set forth in the PPN, and assessed a civil penalty of $8,000 for his "unauthorized travel to Iraq and exportation of services" because "shielding a Government of Iraq (GOI) infrastructure from possible U.S. military action constitutes services to the GOI." OFAC assessed a reduced penalty of $8,000 because this was Clancy's first offense and because he had submitted a written response. The notice was signed by Robert W. Werner.

Clancy filed suit in the Eastern District of Wisconsin against OFAC and its Director, the Secretary of the Department of the Treasury, and the Attorney General of the

United States. The defendants moved to dismiss Clancy's complaint and submitted a certified copy of the administrative record in OFAC's case against Clancy. The district court converted the motion to dismiss to a motion for summary judgment on the administrative record and gave parties the proper notice and time to respond to the motion.

The district court then granted summary judgment to the defendants on all of Clancy's claims. Clancy now appeals from the entry of summary judgment against him.

## II. ANALYSIS

Summary judgment is appropriate only if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We review the district court's grant of summary judgment de novo, construing all facts and inferences in the light most favorable to the nonmoving party. *Five Points Road Joint Venture v. Johanns*, 542 F.3d 1121, 1124 (7th Cir. 2008).

We are guided by the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"), which instructs us to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "[O]ur inquiry is 'searching and careful' but 'the ultimate standard of review is a narrow one.'" *Highway J Citizens Group v. Mineta*, 349 F.3d 938, 952-53 (7th Cir. 2003) (quoting *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989)). We must "consider

whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" but we may not substitute our judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983).

## A. Due Process

Clancy argues that he was deprived of property without receiving adequate process. Specifically, he claims that he should have been afforded discovery, a hearing, an opportunity to call and cross-examine witnesses, and a "neutral decision maker" before OFAC assessed its fine of $8,000.

The government may not deprive a person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. To succeed on a procedural due process claim, a plaintiff must demonstrate a cognizable property interest, a deprivation of that property interest, and a denial of due process. *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004). The defendants do not contest that Clancy has an interest in his money so the only question before us is whether the procedural safeguards established by OFAC are sufficient to protect that interest.

The fundamental requirement of due process is "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). We apply the *Mathews* test when determining

what procedures *are* necessary to ensure that a citizen is not deprived of property without due process of law. That requires us to balance:

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* Not every deprivation of property requires the full arsenal of available procedural safeguards. *See Dixon v. Love*, 431 U.S. 105, 115 (1977) ("[P]rocedural due process in the administrative setting does not always require application of the judicial model."). "Due Process 'is not a technical conception with a fixed content unrelated to time, place[,] and circumstances[;]' instead, it 'is flexible and calls for such procedural protections as the particular situation demands.'" *Hudson*, 374 F.3d at 559 (quoting *Mathews*, 424 U.S. at 334) (alterations in original). The relevant inquiry is not what additional procedures *might* be helpful but whether the existing procedures are constitutionally defective because they present an unreasonable risk of an erroneous deprivation of the private interest, in light of the particular situation (the government's interest and the probable value of additional safeguards).

Prior to assessing its penalty, OFAC provided Clancy with a PPN that described its reasons for believing Clancy had violated the Iraq Sanctions regulations. The PPN notified Clancy of his right to make a written presentation to OFAC responding to the allegations in the PPN. Clancy responded with a lengthy submission. Consideration of the procedures afforded by the regulations in light of the *Mathews* factors leads us to conclude that those procedures did not deprive Clancy of his right to due process.

The private interest affected by OFAC's actions in this case is a monetary interest, the $8,000 fine imposed by OFAC for violation of the regulations. We do not belittle the amount of the fine but we note that such a property interest is less significant than the loss of a job, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985), or the means of a person's livelihood, *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970). Indeed, to the extent that the fine works a great hardship on certain persons, such travelers remain free to first seek approval by OFAC before traveling, thereby avoiding the fine altogether. *Cf. Loudermill*, 470 U.S. at 543 ("While a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job.").

We turn to the risk of erroneous deprivation and the value of additional safeguards. The risk of erroneous deprivation arises from a potential mistake of fact. That is, OFAC might accuse a person of traveling to Iraq when in fact he did not, or assess a fine when the traveler is a

journalist and exempted from the regulations. An appropriate procedure for dealing with this risk is exactly what OFAC provides–pre-penalty notice of the basis for its charge, the underlying facts, and an opportunity to respond. *See, e.g., Hudson*, 374 F.3d at 561 (holding that officers must be given an opportunity to explain their sides of the story before being terminated to avoid mistakes).

Although a hearing might be helpful if there are material facts in dispute, Clancy does not now, nor did he before OFAC, challenge OFAC's allegations that he traveled to Iraq in 2003 in violation of the regulations. He does not identify any material factual disputes that could have been resolved by an evidentiary hearing or cross-examination of witnesses. *See, e.g., Wozniak v. Conry*, 236 F.3d 888, 890 (7th Cir. 2001) ("[E]ven for the most important decisions, an evidentiary hearing is required only if there are material factual disputes."). Nor does he demonstrate how pre-penalty discovery would have allowed him to better defend himself against OFAC's allegations. Indeed, we note that despite having had a chance to examine OFAC's administrative record, Clancy has not challenged OFAC's factual determinations in the district court or on appeal.

Instead of raising factual disputes or circumstances that, if considered by OFAC in a hearing, might plausibly have provided relief from this fine, Clancy argues that additional process would have allowed him the opportunity to develop and assert affirmative defenses. He also insists that "the absence of a neutral fact-finder presiding over an

oral hearing where evidence could be presented and witnesses examined and cross-examined created an unacceptable risk that [OFAC's] mitigating factors and aggravating factors were applied arbitrarily, incorrectly, or inconsistently." Finally, he contends that additional process would have allowed him to challenge the application of 31 C.F.R. § 575.205 to his action as a "human shield." We find these arguments unconvincing.

First, Clancy does not elaborate on whether his so-called affirmative defenses are viable (or even what they are), what mitigating factors a fact-finder should have considered, or, importantly, how any of those things might have resulted in a reduced fine (or no fine) for Clancy. Although the right to additional procedural protections does not depend on a demonstration of "certain success," the deprivation must involve "arguable issues" that plausibly would have prevented an erroneous deprivation. *Loudermill*, 470 U.S. at 544. Clancy simply has not shown that here. Nor has Clancy raised evidentiary disputes that might require a "neutral fact-finder." We therefore are not persuaded that Clancy's vague and hypothetical arguments justify imposing additional procedural burdens on the government. *See also Karpova v. Snow*, 497 F.3d 262, 270-71 (2d Cir. 2007) (concluding the Iraq Sanction regulations did not violate due process rights where the plaintiff presented no disputed facts and where different directors signed the pre-penalty notice and the final penalty notice).

What remains of Clancy's argument is that he was denied the ability to *orally* challenge the validity and

application of the regulations.[1] *See* Appellant Br. 14 ("An oral hearing is particularly important in this case because Clancy claims that OFAC has misinterpreted its statutory authority."). Clancy's arguments do not turn on disputed facts but rather concern the legal implications of Clancy's travel to Iraq. That is not something that requires pre-penalty discovery or an evidentiary hearing. *See, e.g., Loudermill*, 470 U.S. at 543 n. 8 (noting that a person may not "insist on a hearing in order to argue that the decisionmaker should be lenient and depart from legal requirements"); *Dixon*, 431 U.S. at 113-14 (additional procedures were not necessary before taking away the plaintiff's driver's license where factual basis for revocation was undisputed, and licensee was seeking "only to argue that the Secretary should show leniency and depart from his own regulations"). In any event, Clancy was able to make these arguments to OFAC in his response. That OFAC rejected his arguments does not mean Clancy did not receive adequate process.

Turning to the third *Mathews* factor, we do not think the monetary fine is significant enough to impose an additional procedural burden on the government in light of the government's interests in enforcing its national security interests and administrative efficiency. Because Clancy has not succeeded in explaining how any addi-

---

[1] The arguments, challenging the validity of the regulations, OFAC's authority to restrict travel to Iraq, and raising constitutional concerns such as Clancy's First Amendment and due process rights, are nearly identical to the arguments he made before the district court and on this appeal.

tional procedures would hedge against erroneous action, we are not convinced that such procedures are constitutionally required.

## B.  Validity of the Regulations

Clancy challenges the regulations on a number of statutory and constitutional grounds. None has any merit. We begin by clarifying a factual issue. Clancy insists that his travel to Iraq did not financially benefit Iraq and, therefore, is not sanctionable as an "economic" activity. But he provides no evidence supporting that claim or, more importantly, refuting OFAC's contention that he spent money traveling to, and within, Iraq. Therefore, to the extent that there is any meaningful difference between travel to Iraq that financially benefits Iraq and travel that does not, we find it irrelevant to this case.

### 1.  Statutory Authority for the Regulations

Clancy claims the regulations are invalid because they are "ultra vires" and outside legal authority. Specifically, Clancy claims OFAC did not have the authority to ban travel to Iraq.

The regulations were promulgated pursuant to several sources of authority, including (in addition to the several Executive Orders mentioned above) the International Emergency Economic Powers Act, 50 U.S.C. § 1701 ("IEEPA") and the United Nations Participation Act, 22 U.S.C. § 287c(a) ("UNPA"). Additionally, Congress ap-

proved of Executive Orders 12722 and 12724 and directed the President to "continue to impose" economic sanctions in the Iraq Sanctions Act of 1990. Although all of these statutes allow the President to impose economic sanctions during a national emergency, the defendants principally rely on the UNPA and the Iraq Sanctions Act as authorization for the regulations.

The UNPA provides, in relevant part, that the President may "prohibit in whole or in part, economic relations or rail, sea, air, postal, telegraphic, radio, and other means of communication" with another country in order to comply with United Nations directives. 22 U.S.C. § 287c(a). It is beyond dispute that in August 1990, the United Nations Security Council adopted Resolution 661, which called upon all states to prevent their nationals and any persons within their territories from remitting any funds to persons or bodies within Iraq. Pursuant to this Resolution, President Bush issued Executive Order 12724 prohibiting transactions relating to travel to Iraq. The UNPA provided the President with the authority to restrict travel to Iraq as an economic sanction. *See also Karpova*, 497 F.3d at 270 ("swiftly reject[ing]" argument that the Iraq Sanctions regulations exceed the authority Congress gave to the President); *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 776 (9th Cir. 2006) (recognizing that the UNPA authorizes the President to take measures such as limiting air travel when enforcing a UN Security Council resolution).

Clancy contends that his travel to Iraq did not bestow an economic benefit on Iraq and therefore does not fall

within the purview of these statutes, which regulate "economic" transactions. We do not agree. Travel restrictions are meant to stem the flow of currency into a country that, in the opinion of the President, constitutes a threat to our national security. *See Regan v. Wald*, 468 U.S. 222, 243 (1984). And, as discussed above, Clancy never refuted OFAC's allegation that he spent money in Iraq.

Clancy's argument that OFAC, acting under the direction of the President, does not have the authority to ban travel to Iraq ignores the "plain meaning" of the Iraq Sanctions Act, which references and approves of "economic sanctions with respect to Iraq and Kuwait . . ., pursuant to Executive Orders Numbered 12724." Executive Order 12724 prohibits, as an economic sanction, "Any transaction by a United States person relating to travel by any United States citizen or permanent resident alien to Iraq, or to activities by any such person within Iraq" and "Any transaction by a United States person relating to transportation to or from Iraq." Exec. Order No. 12724, 55 Fed. Reg. 33089 (August 9, 1990). *See Khan v. United States*, 548 F.3d 549, 554 (7th Cir. 2008) ("If the plain meaning of [statutory] text either supports or opposes the regulation, then we stop our analysis and either strike or validate the regulation."). Additionally, the UNPA enables the President to impose economic sanctions. We see no reason why Clancy's actions, which involved transportation to Iraq, are not covered by these statutes.

Because we find the regulations were a proper exercise of OFAC's authority under the UNPA and the Iraq Sanc-

tions Act, we need not address Clancy's argument that IEEPA unconstitutionally delegated authority to the President. *See also Regan*, 468 U.S. at 232-33 (regulations promulgated pursuant to the IEEPA and the Trading with the Enemy Act were constitutional); *Zemel v. Rusk*, 381 U.S. 1, 18 (1965) (act giving Secretary of State the power to grant and issue passports did not constitute an invalid delegation of power).

### 2.    Conflict with international law

Next, Clancy claims that the regulations violate international law. According to Clancy, the regulations violate the International Covenant on Civil and Political Rights ("ICCPR"). As is the case with all of his arguments, Clancy fails to advance any meaningful explanation for this argument or to provide relevant authority in support of this claim.

As an initial matter, we fail to see how the agreement helps Clancy. Clancy directs us to Section 12 of the ICCPR, which states: (1) "Everyone lawfully within the territory of a State shall, *within that territory*, have the right to liberty of movement and freedom to choose his residence" (emphasis added) and (2) "Everyone shall be free to leave any country, including his own." Clancy does not make clear how the regulations, which neither restrict Clancy's ability to travel within the United States, nor prohibit him from leaving the United States, are in conflict with this agreement. In any event, the ICCPR is an international agreement that was ratified by the United States "on the express understanding that it was not self-executing and

so did not itself create obligations enforceable in the federal courts." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 692 (2004).

### 3.  Right to Travel

Clancy argues that the regulations are invalid because they restrict his right to international travel, which he maintains is a constitutionally protected right. The freedom to travel outside the United States, unlike the "right" to travel within the United States, is "no more than an aspect of liberty protected by the Due Process Clause." *Haig v. Agee*, 453 U.S. 280, 306 (1981). The Supreme Court affords great deference to restrictions on international travel so long as they are justified by a rational foreign policy consideration. *See Regan*, 468 U.S. at 242 (regulations restricting travel to Cuba justified by foreign policy concerns); *see also Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1439 (9th Cir. 1996) ("Given the lesser importance of this freedom to travel abroad, the Government need only advance a rational, or at most an important, reason for imposing the ban."). Responding to challenges similar to those brought by Clancy, the Supreme Court held that the Fifth Amendment right to travel, standing alone, is insufficient to overcome the foreign policy considerations justifying restrictions on travel to Cuba. *Regan*, 468 U.S. at 242; *see also Zemel*, 381 U.S. at 14 (upholding refusal by Secretary of State to validate the passports of United States citizens for travel to Cuba).

These regulations were issued pursuant to President Bush's declaration of a national emergency with respect to Iraq, and were imposed to ensure that no benefit from the United States flowed to the Government of Iraq. 55 Fed. Reg. 31,803 (1990). We see no reason (and Clancy provides none) to find that these considerations are insufficient to justify the travel restriction imposed by the regulations. *See also Karpova*, 497 F.3d at 272 (travel restriction imposed by the Iraq Sanctions regulations does not violate liberty interest under the Fifth Amendment).

Clancy responds that even if general travel restrictions are constitutional, this one is invalid because it is selectively enforced. It is true that government efforts to selectively restrict travel based on "the basis of political belief or affiliation" are not entitled to the same judicial deference as general bans on travel. *See Aptheker v. Sec'y of State*, 378 U.S. 500, 514 (1964) (rejecting Congress's attempt to deny passports on the basis of an affiliation with the Communist Party); *Kent v. Dulles*, 357 U.S. 116, 130 (1958) (Secretary of State did not have authority to inquire about affiliation with Communist Party before issuing passports). But the Supreme Court has distinguished "general bans on travel" that are imposed because of foreign policy considerations affecting all citizens from selective travel restrictions. *Regan*, 468 U.S. at 241 (distinguishing *Kent* and *Aptheker* on the ground that the "Secretary of State . . . made no effort selectively to deny passports on the basis of political belief or affiliation, but simply imposed a general ban on travel to Cuba following

the break in diplomatic and consular relations with that country in 1961.”). The regulations here do not discriminate among people based on their political affiliation. Rather, they impose a “general ban” on travel to Iraq based on foreign policy considerations affecting all citizens. *See Regan*, 468 U.S. at 241. Clancy provides no evidentiary support for his contention that the government selectively enforces these regulations to penalize only those who speak out publicly to oppose American policies in Iraq.[2]

### 4.   First Amendment Rights

Clancy’s challenge to the regulations on First Amendment grounds faces the same hurdle as his Fifth Amendment right to travel claim. The Supreme Court has held that governmental restrictions on international travel inhibit action rather than speech. *See Haig*, 453 U.S. at 309 (“To the extent the revocation of [a] passport operates to inhibit Agee, ‘it is an inhibition of *action*,’ rather than of speech.”) (quoting *Zemel*, 381 U.S. at 16-17) (emphasis in original).

Clancy attempts to distinguish *Zemel* on the basis of his motivation to travel. The plaintiff in *Zemel* wanted to

---

[2] Clancy complains that he was denied the opportunity to conduct discovery (he filed a motion seeking discovery related to his selective enforcement claims, and defendants responded with a motion for a protective order, the latter of which was granted by the court), but he does not appeal the district court’s discovery ruling.

travel to Cuba to learn more about the state of affairs in Cuba whereas Clancy maintains he traveled to Iraq to express his belief in peace and his protest against government action that would harm innocent Iraqi citizens. This distinction is one without meaning; the Court has "rejected the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 65-66 (2006) (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968) (internal quotation marks omitted)).

Clancy maintains that his travel was "manifestly symbolic" and therefore protected by the First Amendment, which extends to symbolic conduct. But the First Amendment protects only conduct that is "inherently expressive," *Forum for Academic and Institutional Rights, Inc.*, 547 U.S. at 65-66, and we do not agree that Clancy's travel to Iraq is "inherently expressive." A person observing Clancy's travels to Iraq would have no way of knowing what message he intended to express unless Clancy explained it using speech. *Compare, e.g., Texas v. Johnson*, 491 U.S. 397, 406 (1989) (burning the American flag is expressive conduct). This is strong evidence that international travel itself is not inherently expressive. *See Forum for Academic and Institutional Rights, Inc.*, 547 U.S. at 66 ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it.").

### C.   Definition of "Services" in 31 C.F.R. § 575.205

Finally, Clancy challenges OFAC's interpretation of the word "services" in 31 C.F.R. § 575.205. Specifically, he maintains that the action of serving as a "human shield" in Iraq provided no economic benefit to Iraq and, therefore, he could not have provided a service. We give substantial deference to an agency's interpretation of its own regulations "unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

The regulation states, in relevant part:

> Except as otherwise authorized, no goods, technology (including technical data or other information), or services may be exported from the United States, or, if subject to U.S. jurisdiction, exported or reexported from a third country to Iraq, to any entity owned or controlled by the Government of Iraq, or to any entity operated from Iraq, except donated foodstuffs in humanitarian circumstances, and donated supplies intended strictly for medical purposes, the exportation of which has been specifically licensed pursuant to § 575.507, 575.517 or 575.518.

31 C.F.R. § 575.205.

We begin with the allegation against Clancy that he attempted to shield infrastructures in Iraq from possible

U.S. military action. It was not arbitrary and capricious for OFAC to determine that Clancy traveled to Iraq to act as a "human shield" for Iraq. Clancy's own admission to the customs official upon his return from Iraq indicated he had gone to act as a human shield and had stayed at a hotel and a food storage facility to prevent the United States from bombing those buildings.

The regulation does not define "services" so the defendants rely on dictionaries to supply the word's ordinary meaning. Webster's Dictionary defines "service" as "an act of helpful activity; help; aid." Webster's College Dictionary (2d ed. 1997). The purpose of being a human shield is to confer, or attempt to confer, a benefit on a country, namely not being bombed. The defendants' position is that Clancy's actions might have conferred an economic benefit on persons or entities in Iraq, and therefore provided a service to Iraq. Clancy responds that he provided no economic benefit to Iraq and therefore did not provide a service. We acknowledge that the record does not demonstrate that the United States even knew of, much less delayed or halted its bombing of Iraq, as a result of Clancy's presence in Iraq. And clearly Clancy's efforts to prevent the bombing of Iraq were futile. However, Clancy provides no support for his proposition that Iraq must have *realized* an economic benefit from his actions before OFAC could characterize his actions as a "service." It was not unreasonable for OFAC to decide that acting as a human shield provides a "service" in violation of the regulation.

Nor does OFAC's interpretation that the word "services" applied to Clancy's actions exceed its authority under the

governing statutes. Clancy does not argue that the statutes prohibit OFAC from regulating services to Iraq but contends instead that OFAC is allowed only to regulate economic services. As discussed above, however, OFAC's determination that Clancy's act as a human shield constituted a service that might have conferred an economic benefit to Iraq was not arbitrary or capricious. The statutes do not define "services" in a way that compels the opposite result.

Clancy alternatively argues that the term "services" in the regulations is void for vagueness under the Fifth Amendment. The district court did not reach this issue, however, because Clancy raised the argument for the first time in summary judgment. His complaint makes no mention of this claim and we do not think the district court abused its discretion in rejecting the claim. *See Conner v. Ill. Dep't of Natural Res.*, 413 F.3d 675, 679 (7th Cir. 2005).

## III.  CONCLUSION

The judgment of the district court is AFFIRMED.