NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted March 19, 2020[*]
Decided March 30, 2020

**Before**

DANIEL A. MANION, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 19-1563

| | |
|---|---|
| ORLANDO LARRY, | Appeal from the |
| *Plaintiff-Appellant*, | United States District Court for the |
| | Eastern District of Wisconsin. |
| *v.* | |
| | No. 16-cv-1108-pp |
| RUSSELL GOLDSMITH and | |
| MATTHEW FRIEND, | Pamela Pepper, |
| *Defendants-Appellees*. | *Chief Judge*. |

**O R D E R**

Orlando Larry, a former Wisconsin inmate and practicing Muslim, sued prison officials for disciplining him after he prayed next to his bunk at a prohibited time. The district court screened his complaint and dismissed all claims except a free-exercise claim under the First Amendment. *See* 28 U.S.C. § 1915A(a). Later the judge granted the defendants' motion for summary judgment. Because the undisputed facts show that the

---

[*] We agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

prison's policy prohibiting bunk-side prayer at night reasonably relates to the legitimate penological interest of maintaining prison order, we affirm.

While Larry was incarcerated at Columbia Correctional Institution in Wisconsin, he was housed in a general population unit. The unit is divided into four quads. According to Larry (whose view of the facts we accept), each quad has a dayroom, a dining area, and barrack-style bunk beds. When the officers are not walking around the unit, they are stationed at the entrance or between the quads. From their stations the officers cannot see the inmates unless they are on their beds. The night shift has only 30% to 40% of the daytime security staff, so at night the officers do not leave their stations as often as during the day to watch the inmates.

With reduced staffing at night, the prison has prohibited inmates from praying off their bunks at night. Prison policy states that during day hours, inmates may move freely around the unit and talk, exercise, or pray. They may pray "in the area on the side of their bunks … during dayroom hours only." The dayroom is closed at night (called "quiet hours") from 9 p.m. until 7:30 a.m. At those times "inmates are required to remain at their bunks" except to use lockers and restrooms.

As a practicing Muslim, Larry completes five cycles of prayer every day. A cycle of prayer includes standing, sitting, kneeling, and prostrating. Larry performs his prayers on the floor; there is not enough vertical room on his bunk to complete his prayers. The timing of each cycle of prayer varies according to sunrise and sunset.

On August 2, 2011, during quiet hours just after 10 p.m. as Larry prepared for his fifth cycle of prayer, Officer Russell Goldsmith approached another Muslim inmate praying on the side of his bunk and ordered him to stop. Larry advised Goldsmith that they were Muslim and according to a prayer schedule the prison chaplain gave Larry, Muslims were supposed to start a prayer at 9:55 p.m. that day. Goldsmith responded that off-bunk praying is not permitted when the dayroom is closed and anyone who disobeyed would receive a conduct report. Despite this warning, Larry prayed off his bunk, and after he finished his prayer, Goldsmith issued him a conduct report. The prison's discipline committee found Larry guilty of disobeying orders, engaging in disruptive conduct, and violating prison policies. He received 60 days of disciplinary separation, which the warden affirmed.

After Larry exhausted his administrative remedies, he sued prison officials under 42 U.S.C. § 1983, alleging that they violated his constitutional rights. The judge

permitted Larry to proceed with a free-exercise claim under the First Amendment against Goldsmith. She then granted Goldsmith's motion for summary judgment. (The judge also dismissed another defendant for lack of personal involvement, a ruling not challenged on appeal.) The judge ruled that even though a jury could find that Goldsmith interfered with Larry's religious practice when he enforced the prison's policy, that interference did not violate Larry's free-exercise right because the policy was reasonably related to prison security. She also noted Larry's contention, raised in his opposition to summary judgment, that Goldsmith violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, and the First Amendment by retaliating against him with discipline. But the judge ruled that Larry did not list these legal theories in his complaint, so he waived them.

On appeal Larry argues that his free-exercise claim should survive summary judgment because the ban on bunk-side prayer at night is not reasonably related to the prison's legitimate interests. Prison officials may not substantially interfere with an inmate's ability to practice his religion unless the restriction reasonably relates to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 87 (1987). Courts consider four factors when evaluating a prison policy against a First Amendment claim: (1) whether the policy rationally relates to a legitimate governmental objective; (2) whether the inmate has an alternative means of exercising the right; (3) the impact that accommodating the right will have on security; and (4) whether ready alternatives exist to the prison's policy. *Tarpley v. Allen County*, 312 F.3d 895, 898 (7th Cir. 2002). All of these factors weigh against Larry's claim.

We begin with the first factor and conclude that the ban on off-bunk prayer at night is rationally related to the legitimate goal of preserving order when staffing is reduced. The Supreme Court in *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 345 (1987), upheld a prison rule that barred Muslim inmates from attending a religious service. The prison had valid "concerns of institutional order and security … during that part of the day" when staffing was inadequate to monitor the inmates. *Id.* at 350–51. This norm applies here. Inmates at Columbia must stay in their bunks at night so officers can see them from the stations because the night staff has about one-third of the daytime staff available to walk around and maintain safety. Larry replies that officers sometimes walk around at night because of blind spots from the stations and that the policy permits inmates to leave their bunks at night to use restrooms and lockers. But fewer officers at night are occupied with these responsibilities. No evidence suggests that the nighttime staff can handle the added responsibility of regularly watching inmates who leave their bunks for reasons other than restroom or locker use.

The second factor in *O'Lone*—alternative means of worship—also weighs decisively against Larry's claim. It is true that "the very stringent requirements" about the timing of this worship "may make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend" to it. *Id.* at 351. But even if Larry must miss a cycle of prayer, the relevant question is whether Larry "retain[s] the ability to participate in other Muslim religious ceremonies." *Id*. at 352; *see also Hadi v. Horn*, 830 F.2d 779, 785–86 (7th Cir. 1987). And he does not dispute that each day he can freely perform the other prayer cycles that fall outside of quiet hours.

The third and fourth factors (the impact of off-bunk praying on security and the cost of alternatives to the ban) also weigh in favor of the prison. As already explained, the undisputed evidence shows that permitting Muslim inmates to pray next to their bunks at night would either require more prison staff or leave some inmates unmonitored. Either depletion of resources or loss of security weighs in the prison's favor. *See Turner*, 482 U.S. at 90. Larry suggests that the prison could permit inmates to pray one at a time in the view of the guards. But an alternative to a prison's rule must not impose more than a de minimus effect on the valid penological goal. *See Overton v. Bazzetta*, 539 U.S. 126, 136 (2003). With prayers of multiple Muslim inmates starting one after another every evening, Larry's proposal would have "more than a negligible effect" on either prison staffing or the effective oversight of all inmates. *Id.*

Larry also unpersuasively challenges the judge's ruling that he waived his claims under RLUIPA and for retaliation by waiting until his opposition to summary judgment to raise them. Although a plaintiff need not plead legal theories in a complaint, *see* FED. R. CIV. P. 8(a), Larry identified the theory that he wanted to use—the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb. Having told the district court that he intended to pursue the RFRA theory (which he has since abandoned), the judge need not have indulged his switch to RLUIPA so late in the case. *See Clancy v. Office of Foreign Assets Control of U.S. Dep't of Treasury*, 559 F.3d 595, 606–07 (7th Cir. 2009). Finally, as for his claim of retaliation, it is doomed for the same reason that the free-exercise claim fails: Larry did not have the right to pray next to his bunk after night hours, so punishing him for doing so was not unlawful retaliation.

AFFIRMED